KLINGERIT, INC. *v.* UNITED STATES

**No. 6159.**—Invoices dated Gumpoldskirchen, Austria, May 2, 1938, etc.
Certified May 4, 1938, etc.
Entered at New York, N. Y., May 20, 1938, etc.
Entry No. 114908, etc.

Second Division, Appellate Term

(Decided June 4, 1945)

*Benjamin A. Levett* (*Benjamin A. Levett* and *Meyer Ohlbaum* of counsel) for the appellant.

*Paul P. Rao*, Assistant Attorney General (*Daniel I. Auster*, special attorney), for the appellee.

Before TILSON, LAWRENCE, and EKWALL, Judges; TILSON, J., dissenting

LAWRENCE, Judge: The two appeals for reappraisement covered by this application for review, together with appeal for reappraisement No. 136443–A, in the name of the same parties, were tried together and disposed of by the trial judge in one decision and judgment (Reap. Dec. 5944). The Government filed an application for review as to reappraisement No. 136443–A, and the importer filed the application for review herein. Each application is being decided separately, but the decisions will be published concurrently.

The merchandise consists of certain asbestos goods manufactured in Austria and exported therefrom in May 1938, when that country was under the *de facto* administrative control of Germany. It was appraised, according to the contention of the Government, in German reichsmarks. The appellant, however, contends, to quote from its brief—

That the proper appraised value of the merchandise in question is that found by the appraiser in Austrian shillings, such value being presumptively correct and not challenged by appellant; that in view of such presumption and the absence

of any challenge by appellant they should be found by this court as the proper dutiable value.

While both parties litigant rely upon the return of value by the appraiser, there is a sharp dispute between the parties as to precisely what constituted his return. This conflict will be explained in detail later in this opinion.

A preliminary question is presented, due to the fact that during the progress of the trial appellant secured the issuance of subpoenas duces tecum directed to the Assistant Attorney General in Charge of Customs and the Director of the Customs Information Exchange, respectively, to produce "a certain special agent's report or reports" which appear to have been relied upon by the examiner in making his advisory return of value to the appraiser.

Motion was made on behalf of the United States to quash the subpoena directed to the Assistant Attorney General. After oral argument and submission of briefs the trial judge granted the motion to quash, and of his own motion also ordered that the subpoena duces tecum issued to the Director of the Customs Information Exchange likewise be quashed, and an order was entered accordingly. Appellant, by appropriate assignment of error, challenges the correctness of that action.

It appears from the record that in a letter (exhibit 2) from the Assistant Secretary of the Treasury Herbert E. Gaston to the Director of the Customs Information Exchange, the opinion was expressed that the disclosure of the information contained in the documents sought to be produced pursuant to the subpoenas "would be inimical to the public interest." In support of the Government's motion to quash the subpoena directed to the Assistant Attorney General, that officer filed with the court, subsequent to the submission of the case on the motion to quash, an affidavit to which was attached a letter of similar import to exhibit 2, *supra*, addressed to him by Assistant Secretary of the Treasury Gaston. Appellant complains that said affidavit and letter were filed without notice to it, and contends that the court below improperly based its ruling quashing the subpoena addressed to the Assistant Attorney General upon the letter of the Assistant Secretary of the Treasury, and, moreover,

that irrespective of whether the letter was or was not in the record, the question of whether the disclosure of the reports would be "inimical to the public interest" was for the court to decide upon a personal inspection of the reports.

We find it unnecessary to decide whether or not it was error for the court to base its order quashing the subpoena directed to the Assistant Attorney General upon the letter of the Assistant Secretary of the Treasury which was attached to the affidavit filed without notice to the appellant, in view of the fact that a letter of like import was properly admitted in evidence as exhibit 2.

The question whether it was for the court, rather than the Assistant Secretary of the Treasury, to decide if the disclosure of the contents of the reports would be inimical to the public interest, is no longer open to debate. That question is well settled in this jurisdiction. *Knauth, Nachod & Kuhne et al.* v. *United States*, 23 Treas. Dec. 342, T. D. 32925 (G. A. 7401). That case has stood for more than 30 years as a declaration of the law applicable in circumstances similar to those presented in this case, and rests upon no less eminent authority than *United States* v. *Burr*, 25 Fed. Cases 30, and *Marbury* v. *Madison*, 1 Cranch (5 U. S.) 137, 2 Law Ed. 60. ·

In the *Knauth* case, *supra*, it was said:

\* \* \* If the Secretary of the Treasury could be compelled to produce in court a communication which he asserts to be confidential, and which it would be against public policy to produce, then the Secretary of State could be so compelled, and important diplomatic matters depending for their success entirely upon the discretion and secrecy with which they are conducted might be given that publicity which properly surrounds all judicial procedure. The very statement of such a proposition carries its own answer.

And the court concluded—

—that the letter of the Assistant Secretary of the Treasury is a complete answer to the subpoena, and the subpoena is discharged.

Accordingly, we find no error in the order of the trial court quashing the subpoenas duces tecum directed to the Assistant Attorney General in Charge of Customs and to the Director of the Customs Information Exchange, respectively.

Turning now to the merits of the controversy, we find on the invoice covered by reappraisement No. 134744–A the following red-ink notation of the examiner:

Appraisal basis (F. M. V.) at 6.20 Austrian Schillings
Plus 10% for thinness on $\frac{1}{32}''$ only
Less 0.20 A. Sch per Kilo rebate
Less quantity discount 2%, less bonus 10%
Plus turnover tax 3.7% and crisis tax 3.7%
Plus packing.
Appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis. Adv F. M. V.

The invoice covered by reappraisement No. 134747–A bears the following notation made by the examiner in red ink:

*Appr. Basis:*
Items ⊗ above at units checked in red, Less 15% discount, plus 7.4% taxes, plus packing. FMV
Items ⊕ above at units checked in red, Plus 7.4% taxes, plus packing. FMV
Items ⊗ and ⊕ appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis.

As pointed out, *infra*, the foregoing reports of the examiner were adopted by the appraiser.

It is the contention of the appellant that the above-quoted language down to and including the words "plus packing" in each instance constituted a complete and final appraisal, and that the language following the words "plus packing" was "purely gratuitous * * * and of no effect," and that the—

—attempted reappraisement [sic] on the basis of Reichsmarks was illegal, null and void, the proper conversion of currency being solely within the function of the Collector of Customs * * *.

In our opinion the language down to and including the words "plus packing" merely gives the calculating factors which formed the bases of the conclusions reached by the appraiser as expressed in the language following the words "plus packing," reading, in one instance—

Appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis. Adv F. M. V.

and in the other—

Items ⊗ and ⊕ appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis.

In other words, the first part of the red-ink notation on each of the invoices is precisely what it is designated to be, namely, an "appraisal basis," and the remaining part of the notation is the appraiser's return of value of the merchandise in German reichsmarks predicated on the "foregoing appraisal basis."

The apparent reason for appraising the merchandise in German reichsmarks is disclosed by a reference to T. D. 50029, 75 Treas. Dec. 192, dated December 11, 1939, wherein it appears that the Secretary of the Treasury was advised by the Secretary of State, under date of December 1, 1939, with regard to the territories then under the de-facto administrative control of Germany, in part as follows:

On April 5, 1938 this Department notified you that for all practical purposes. the disappearance of the Republic of Austria as an independent state and its. incorporation in the territory of the German Government must be accepted as a fact.

Doubtless in view of this information the appraiser found it necessary to appraise the merchandise (which was exported in May 1938) in German reichsmarks which, it is fair to assume, became the prevailing currency with the "disappearance of the Republic of Austria" as above set forth. In such circumstances it would have been inappropriate for the appraiser to attempt to find a value for the merchandise in Austrian schillings, purporting to be the currency of the country of exportation, when as a matter of fact Austria had, prior to the date of exportation, disappeared "for all practical purposes."

We see no reason for disregarding the express statements on the invoices that the merchandise was "appraised in German Reichsmarks." The examiner's red-ink notations upon the invoices were

apparently adopted in their entirety by the appraiser, as is indicated by him on the summary sheets attached to the invoices, and illustrate some of the "reasonable ways and means" employed by him in arriving at his appraised values (Sec. 500 (a) (1), Tariff Act of 1930). And while he did not specifically state the exact number of reichsmarks per unit of appraisement, nevertheless, he did give sufficient information upon which the collector in due course could proceed to convert the currency "For the purpose of the assessment and collection of duties," pursuant to section 522 of the Tariff Act of 1930. Note *Collin & Gissel* v. *United States*, 71 Treas. Dec. 1227, Reap. Dec. 4004, affirmed in 72 Treas. Dec. 1210, Reap. Dec. 4183, and *United States* v. *Sontag's Shoe Stores*, 14 Cust. Ct. 314, Reap. Dec. 6091, decided February 1, 1945, reversing Reap. Dec. 5797.

The action of the appraiser upon the summary sheets attached to the invoices is his seal of approval of the red-ink notations on the invoices. Consequently, there would seem to be no justification in fact or in law for dividing the red-ink notations into two separate parts, treating one part as the complete appraisement, and ignoring the other as a nullity and hence merely surplusage, as contended by the appellant. The notations should be accepted, or rejected, in their entirety.

It may clarify the situation somewhat to point out that the invoices disclose the "purchase price" of the merchandise in United States currency and state the "Home Market Value" in Austrian schillings.

However, as above indicated, it would scarcely be reasonable for the appraiser in the circumstances of this case to find a value in Austrian schillings when, prior to the date of exportation, Austria had ceased to exist as an independent state.

In the brief filed on behalf of the appellant it is argued that "the appraiser having found the value in Austrian schillings, it was beyond his power and duty to convert such values into another currency."

While it is frequently stated that the conversion of currency is peculiarly the function of the collector of customs, nevertheless, it is not strictly accurate to confine the function solely to that officer. Obviously, article 776 of the Customs Regulations of 1937 contemplates that the conversion of currency "for the purpose of comparison," as indicated in subparagraph (e) thereof, is to be performed by the appraiser.

It will be observed that section 500 of the Tariff Act of 1930, defining the duties of appraising officers, declares in subparagraph (a) thereof, that the appraiser shall perform his duties—

\* \* \* under such rules and regulations as the Secretary of the Treasury may prescribe—

Subparagraph (e) of article 776, *supra*, is preceded by the general admonition that the appraiser, among other things, "will observe the

following rules in making returns on invoices." Said subparagraph (e) reads: .

(e) When merchandise identical with or similar to that under appraisement is sold for domestic consumption and for exportation *in different currencies in the country of exportation, the currencies involved should, for the purpose of comparison to determine whether the foreign or export value is the higher, be converted into United States currency at the rate certified by the Federal reserve bank for the date of exportation of the merchandise involved;* but the currency expressed in the appraiser's return should be the currency in which identical or similar merchandise is usually bought and sold in the ordinary course of trade for domestic consumption in the country of exportation or for exportation to the United States, depending upon whether the foreign or export value is adopted as the basis of appraisement. [Italics supplied.]

The italicized language in the above quotation clearly discloses that under certain conditions it is incumbent upon the appraiser to convert different currencies "for the purpose of comparison" as above indicated, and his action in ascertaining, estimating, and appraising merchandise, to the extent that his processes involve the conversion of currency, is legal. This conclusion is confirmed by the language of subparagraph (f) of said article 776 which reads:

(f) The conversion of currency, being a function of the collector, *is not related to the determination of the unit values of merchandise or of the costs, charges, etc., entering into the determination of dutiable values,* and it is not the duty of appraising officers to find or state the value of currency. [Italics supplied.]

The apparent purpose of subparagraph (f), *supra*, was to make it clear that the conversion of currency, being a function of the collector "For the purpose of the assessment and collection of duties" pursuant to section 522 of the Tariff Act of 1930, has no relation to the action of the appraiser in converting currency "for the purpose of comparison" in ascertaining "the unit values of merchandise or of the costs, charges, etc., entering into the determination of dutiable values" of the merchandise, which latter action, pursuant to subparagraph (e), *supra*, is the function of the appraiser.

The value found by the appraiser is presumptively correct, and the burden rested upon the party who challenged its correctness to prove otherwise (section 501, Tariff Act of 1930). The return of the appraiser carries with it the presumption that the German reichsmark was the "currency of the country of exportation in which merchandise identical with or similar to that under appraisement" was at the time of exportation "bought and sold in the ordinary course of trade" (article 776 (b), Customs Regulations of 1937). There is no competent proof to the contrary, nor is there any proof which would establish values for the merchandise other than those found by the appraiser.

For the foregoing reasons we affirm the finding of the trial judge in substance that the proper basis of value of the merchandise covered

by these appeals was the foreign value, as found by the appraiser, and that the values of the various items were, in each case, the values returned by the appraiser in reichsmarks.

Judgment will be entered accordingly.

DISSENTING OPINION IN PART

TILSON, Judge: The following, upon a subject duly assigned to me, was prepared as the majority opinion, but since my associates disagree with the views expressed, the same, with the exception of minor and necessary changes, and the indicated addition, is published as my dissent:

This application for a review of the decision of the lower court was filed under the provisions of section 501 of the Tariff Act of 1930. Appellant has filed 12 assignments of error, which include both affirmative and negative assignments of error. In view of the conclusion which I have reached it will not be necessary to set out and discuss each assignment of error in detail. Those assignments of error which I consider pertinent to a disposition of this case are as follows:

5. In finding and holding that the appraiser was not attempting to convert the currency of the unit price of the merchandise in making the appraisements in question, but that he was appraising the merchandise in the currency required by the provisions of Art. 776 (b) of the Customs Regulations.

7. In not finding and holding that the proper dutiable values of the merchandise in question were the invoice unit values in Austrian shillings less discounts, and plus taxes and packing as noted by the examiner on the invoices in question and approved by the appraiser in his appraisement.

8. In not holding and finding that in making the appraisement as set forth in No. 7, the appraiser complied with the law and made a complete appraisement of the merchandise in question.

11. In granting the motion of Paul P. Rao, Assistant Attorney General to quash the subpoena duces tecum served upon him and issued by Judge Walker April 7, 1942, directing him to appear and produce certain documents and testify on behalf of the appellant on the trial of the case before Judge Walker and further ordering and quashing the subpoena duces tecum issued by Judge Walker and directed to Chas. B. Webb on March 20, 1942 for the same purpose, the order granting such motion to quash having been signed and filed in the office of the Clerk of the United States Customs Court on Oct. 14, 1942.

At the trial of the case counsel for appellant produced as witnesses, Theodore Strahman, Jr., secretary of appellant, and Henry H. Crum, assistant appraiser of merchandise at the port of New York. The first witness testified that he was familiar with the merchandise covered by this review and that the prices shown on the invoices were the exact prices his firm paid for the merchandise; that during the pendency of the appraisement of this merchandise the only information he was able to obtain regarding the market value was a price list dated 1937, which was admitted in evidence as exhibit 1; and that the mer-

chandise consists of sheets of plain asbestos packing, asbestos gaskets, and asbestos valve rings.

The second witness testified that at the present time he is an assistant appraiser of merchandise, but that at the time of the appraisement of the instant merchandise he was an examiner of merchandise; that in making his appraisement it was based upon several special agent's reports; and that he did not have the reports with him, but he presumed "the attorney has it." '

Mr. LEVETT: I will ask the attorney to produce that report so I may offer it in evidence.

Mr. AUSTER: The Government will refuse to offer it to Counsel.

Mr. LEVETT: I would ask Your Honor to subpoena the report. It is here, and I would like to see it. The refusal of the Attorney, his refusal to produce that I think is the subject of a very grave question of ethics. The Government is here to find the truth. If they have the truth in that report, we are entitled to it.

Judge WALKER: What is your objection to producing it?

Mr. AUSTER: My objection is, that this Attorney has to prove his case, he has the laboring oar, he has the burden of proof, and he cannot come into court and ask the Government "What have you got? Give it to me and I will prove my case." Moreover if he wants them he can get them by serving subpoenas upon the Commissioner of Customs, or the Secretary of the Treasury, not upon Counsel. When these reports are in Counsel's possession, they are privileged communications between attorney and client.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Judge WALKER: It is my information it is admissible if properly called into evidence, and if you wish to delay the proceedings Mr. Auster, that is all right. I think I will insist the document be presented, if a subpoena duces tecum or whatever it may be that is necessary, is submitted.

Mr. AUSTER: I will object to his request at this stage of the proceedings. I desire that Your Honor understand my position. *I am not saying that I may not offer it of my own volition*, but I do oppose this manner or means of obtaining it, and I am not going to be a party to it. *I may decide to offer it myself*, after I see how far, how much of a case he has, but I am not going to prove his case for him. That is up to him.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

Mr. LEVETT: If Your Honor please, I would like to make this statement: We have tried of course to get evidence from the other side, but due to the War, we cannot get it any more than we have. Now that is the reason I ask that the Special Agent's report be produced. I have no doubt that the Special Agent was efficient. I haven't seen the report, but I am willing to offer the report in evidence, even without seeing it. [Italics ours.]

Thereafter on March 20, 1942, the trial court issued a subpoena duces tecum directed to Charles B. Webb, in charge of the office of the Customs Information Exchange at New York, to produce "a certain special agent's report or reports or copies thereof covering importations made by the Plaintiff during the years 1937 and 1938 and consulated in Vienna, Austria particularly concerning the value of the merchandise covered by said importations · \*· \*· \*'' and reciting the invoice and entry numbers.

Likewise on April 7, 1942, the trial court issued a subpoena duces tecum directed to Paul P. Rao, Assistant Attorney General in Charge of Customs, to produce the same document which Mr. Webb had been directed to produce.

On April 10, 1942, the Assistant Attorney General in Charge of Customs filed in this court a motion to quash the subpoena served upon him. In his affidavit in support of his motion to quash, filed on June 15, 1942, the Assistant Attorney General in Charge of Customs for the first time avers that he "* * * has received a letter dated June 5, 1942, signed by Herbert E. Gaston, Assistant Secretary of the Treasury, the original of which is hereto annexed, stating that reports of the Treasury Department representatives relating to the questions involved in these cases are confidential in nature 'and that their disclosure at this time pursuant to the subpoena would be inimical to the public interest'."

Thereafter on October 14, 1942, the trial court granted the motion to quash the subpoena served upon the Assistant Attorney General, and "* * * in view of the fact that the subpoena issued to Mr. Webb relates to the same documents, although there is at present no motion before me to quash that subpoena, I, on my own motion, quash the same."

On December 11, 1942, counsel for appellant herein duly filed in this court his exceptions to the order of the trial court quashing said subpoenas, which the trial court ordered filed as a part of the record in this case. It is also to be noted that counsel for appellant herein included in his assignments of error of the trial court a specific assignment that the trial court erred in granting the motion of the Assistant Attorney General in Charge of Customs to quash said subpoenas. Thus the question is brought squarely before us for review.

In view of the fact that if it should be held that the trial court erred in quashing the subpoena served upon the Assistant Attorney General in Charge of Customs and in effect refusing to require the production of the special agent's report to be admitted in evidence, the decision and judgment of the trial court would have to be reversed and the case remanded, I shall consider that question first. The question of whether or not the Government can be required to produce special agent's reports upon the request of the opposite party, or under a subpoena duces tecum, appears to be one concerning which diverse opinions are entertained. In an effort to settle this uncertainty I shall deal with the subject rather fully.

It clearly appears that when this question was first presented to it the trial court entertained the view that the special agent's report was subject to production, under a proper subpoena, to be admitted in evidence in this case. However, it is to be noted that the trial court later granted a motion to quash the subpoena under which it was

sought to obtain the report. In view of the fact that literally thousands of such and similar special agent's reports are produced by the Government and offered in evidence in the trial of reappraisement cases before this court, and my familiarity with the contents of such reports, it was my first impression that this report was subject to be produced under the subpoena issued in this case, and used as evidence in the case as an aid to the court in the performance of its duty in finding the proper dutiable value of the merchandise, and I am frank to admit that had no other objections been interposed save those presented to the trial court originally, I would have reversed the decision of the trial court quashing the subpoena. This view is based upon my repeated examination of special agent's reports in evidence in cases properly before me, in none of which reports have I ever found a single word of confidential matter, and in none of which have I ever found a single word which "would be inimical to the public interest."

It is not to be presumed that the introduction of the special agent's report in this case would subject it to the same publicity as would follow if it were printed in all the newspapers in the United States. Under the rules and practice of this court all papers are kept in the office of the clerk of the court until the case has been submitted for decision, at which time they are delivered to the proper judge, and such papers are not accessible for inspection or use by anyone, other than the parties to the case and their counsel. It will therefore be seen that had the report been admitted in evidence it would have been subjected to only the slightest publicity. While all hearings before this court are public, the court records are open to inspection by the parties in interest and their counsel only.

In *United States* v. *Burr*, 25 Fed. Cases, 30, Chief Justice Marshall stated the question there to be decided as follows:

* * * The object of the motion now to be decided is to obtain copies of certain orders, understood to have been issued to the land and naval officers of the United States for the apprehension of the accused, and an original letter from General Wilkinson to the president in relation to the accused, with the answer of the president to that letter, which papers are supposed to be material to the defence. As the legal mode of effecting this object, a motion is made for a subpoena duces tecum, to be directed to the president of the United States.

In deciding that motion Chief Justice Marshall said:

The second objection is, that the letter contains matter which ought not to be disclosed. That there may be matter, the production of which the court would not require, is certain; but in a capital case, that the accused ought, in some form, to have the benefit of it, if it were really essential to his defence, is a position which the court would very reluctantly deny. It ought not to be believed that the department which superintends prosecutions in criminal cases, would be inclined to withhold it. What ought to be done under such circumstances presents a delicate question, the discussion of which, it is hoped, will never be rendered necessary in this country. At present it need only be said that the question does not occur at this time. There is certainly nothing before the court which shows

that the letter in question contains any matter the disclosure of which would endanger the public safety. If it does contain such matter, the fact may appear before the disclosure it made. If it does contain any matter which it would be imprudent to disclose, which it is not the wish of the executive to disclose, such matter, if it be not immediately and essentially applicable to the point, will, of course, be suppressed. It is not easy to conceive that so much of the letter as relates to the conduct of the accused can be a subject of delicacy with the president. Everything of this kind, however, will have its due consideration on the return of the subpoena.

As an expression of the views of the President of the United States as to what papers or documents he should or should not be required to produce under a subpoena duces tecum, the following is quoted from *United States* v. *Burr*, 25 Fed. Cases, 55 (at p. 69):

"With respect to papers, there is certainly a public and private side to our offices. To the former belong grants of land, patents for inventions, certain commissions, proclamations, and other papers patent in their nature. To the other belong mere executive proceedings. All nations have found it necessary that, for the advantageous conduct of their affairs, some of these proceedings, at least, should remain known to their executive functionary only. He, of course, from the nature of the case, must be the sole judge of which of them the public interest will permit publication. Hence, under our constitution, in requests of papers from the legislative to the executive branch, an exception is carefully expressed, 'as to those which he may deem the public welfare may require not to be disclosed,' as you will see in the inclosed resolution of the house of representatives, which produced the message of January 22d, respecting this case. The respect mutually due between the constituted authorities in their official intercourse, as well as sincere dispositions to do for every one what is just, will always insure from the executive, in exercising the duty of discrimination confided to him, the same candor and integrity to which the nation has, in like manner, trusted in the disposal of its judiciary authorities. Considering you as the organ for communicating these sentiments to the court, I address them to you for that purpose, and salute you with esteem and respect.

THOS. JEFFERSON."

Again in *United States* v. *Burr*, 25 Fed. Cases, 187 (at p. 190), Chief Justice Marshall delivered the following opinion with regard to a subpoena duces tecum directed to the President of the United States requiring him to produce a certain letter:

It is not without regret that I find myself constrained to deliver an opinion on the present application. To overrule the motion may, at least, have the appearance of imposing a hardship on the prisoner, and to grant it may occasion delay in a case which all must desire to terminate. It is with regret that I decide a question under such circumstances, because it is probable that those parts of the letter which are withheld, are of much less importance than gentlemen suppose; and that the effect of their production would be to dissipate suspicions which are now entertained, and to show that the subject of the controversy is by no means proportioned to the zeal with which it has been maintained. Upon an affidavit made by the accused, a subpoena duces tecum has been awarded to the president of the United States, requiring the production of this letter. In consequence of this process the letter was transmitted to the attorney for the United States, accompanied with a communication from the president, authorizing the attorney to exercise his discretion in the case. In the exercise of this discretion, he has

selected certain parts of the letter which he has determined to withhold, because he believes them to be confidential, and therefore such as ought not to be exhibited in public. If this might be likened to a civil case, the law is express on the subject. It is that either party may require the other to produce books or writings in their possession or power, which contain evidence pertinent to the issue. In this respect the courts of law are invested with the power of a court of chancery, and if the order be disobeyed by the plaintiff, judgment as in the case of a nonsuit may be entered against him.

Now, if a paper be in possession of the opposite party, what statement of its contents or applicability can be expected from the person who claims its production, he not precisely knowing its contents? If the opposite party be required to produce his books on a particular subject, it is not necessary that the entries on those books should be stated in order to entitle the applicant to his motion. He cannot be expected to make such a statement. It has always been deemed sufficient to describe the paper required, to express its general purport, and to state its materiality to the case in some degree, even when its contents are known. When a paper is in possession of one party, it is completely in his power, and is required by the other, very strong reasons must be given to justify its being withheld, if it have any relation to the case. Before a court would make a decisive order in such a case it certainly ought to receive reasonable satisfaction of the probable materiality of the evidence asked for and refused, and of its relation to the pending controversy; but the information to be required must depend on the nature of the case.

Criminal cases, it is true, are not provided for; but courts will always apply the rules of evidence to criminal prosecutions so as to treat the defence with as much liberality and tenderness as the case will admit. The prosecutor is the representative of the government, and the government acts as a party through the agency of the attorney, who directs and manages the prosecution on behalf of government. If there be a paper in the possession of the executive, which is not of an official nature, he must stand, as respects that paper, in nearly the same situation with any other individual who possesses a paper which might be required for the defence. If the executive possess a paper which is really believed by the accused to be material to his defence, ought it to be withheld? The question will recur, is it really material to his defence? The only evidence that can be received on this point is from the party himself, and he has made his affidavit to its materiality. But that is said to be insufficient; and why? Because the averment is, that the letter "may be material" in the defence. Until the course of the prosecution shall be fully developed, it may not be in the power of the accused to make a more positive averment. The importance of the letter to the defence, may depend on the testimony adduced by the prosecutor. But there were two indictments: the one for treason and the other for a misdemeanor, and the allegation of materiality made in the affidavit may, it is said, refer to either indictment. But the prosecution for treason is terminated, and was terminated before the affidavit was made. Consequently it can relate only to the indictment for a misdemeanor. It is objected that the particular passages of the letter which are required are not pointed out. But how can this be done while the letter itself is withheld? Or how can their applicability be shown without requiring the accused prematurely to disclose his defence?

Let it be supposed that the letter may not contain anything respecting the person now before the court. Still it may respect a witness material in the case, and become important by bearing on his testimony. Different representations may have been made by that witness, or his conduct may have been such as to affect his testimony. In various modes a paper may bear upon the case, although before the case be opened its particular application cannot be perceived by the judge.

That the president of the United States may be subpoenaed, and examined as a witness, and required to produce any paper in his possession, is not controverted. I cannot, however, on this point, go the whole length for which counsel have contended. The president, although subject to the general rules which apply to others, may have sufficient motives for declining to produce a particular paper, and those motives may be such as to restrain the court from enforcing its production. I do not think precisely with the gentlemen on either side. I can readily conceive that the president might receive a letter which it would be improper to exhibit in public, because of the manifest inconvenience of its exposure. The occasion for demanding it ought, in such a case, to be very strong, and to be fully shown to the court before its production could be insisted on. I admit, that in such a case, much reliance must be placed on the declaration of the president; and I do think that a privilege does exist to withhold private letters of a certain description. The reason is this: Letters to the president in his private character, are often written to him in consequence of his public character, and may relate to public concerns. Such a letter, though it be a private one, seems to partake of the character of an official paper, and to be such as ought not on light ground to be forced into public view.

Yet it is a very serious thing, if such letter should contain any information material to the defence, to withhold from the accused the power of making use of it. It is a very serious thing to proceed to trial under such circumstances. I cannot precisely lay down any general rule for such a case. Perhaps the court ought to consider the reasons which would induce the president to refuse to exhibit such a letter as conclusive on it, unless such letter could be shown to be absolutely necessary in the defence. The president may himself state the particular reasons which may have induced him to withhold a paper, and the court would unquestionably allow their full force to those reasons. At the same time, the court could not refuse to pay proper attention to the affidavit of the accused. But on objections being made by the president to the production of a paper, the court would not proceed further in the case without such an affidavit as would clearly show the paper to be essential to the justice of the case. On the present occasion the court would willingly hear further testimony on the materiality of the paper required, but that is not offered.

In no case of this kind would a court be required to proceed against the president as against an ordinary individual. The objections to such a course are so strong and so obvious, that all must acknowledge them. But to induce the court to take any definite and decisive step with respect to the prosecution, founded on the refusal of the president to exhibit a paper, for reasons stated by himself, the materiality of that paper ought to be shown. In this case, however, the president has assigned no reason whatever for withholding the paper called for. The propriety of withholding it must be decided by himself, not by another for him. Of the weight of the reasons for and against producing it, he is himself the judge. It is their operation on his mind, not on the mind of others, which must be respected by the court. They must therefore be approved by himself, and not be the mere suggestions of another for him. It does not even appear to the court that the president does object to the production of any part of this letter. The objection, and the reasons in support of the objection, proceed from the attorney himself, and are not understood to emanate from the president. He submits it to the discretion of the attorney. Of course, it is to be understood that he has no objections to the production of the whole, if the attorney has not. Had the president, when he transmitted it, subjected it to certain restrictions, and stated that in his judgment the public interest required certain parts of it to be kept secret, and had accordingly made a reservation of them, all proper respect would have been paid to it; but he has made no such reservation. As to the use to be made of the letter,

it is impossible that either the court or the attorney can know in what manner it is intended to be used. The declarations therefore made upon that subject can have no weight. Neither can any argument on its materiality or immateriality drawn from the supposed contents of the parts in question. The only ground laid for the court to act upon is the affidavit of the accused; and from that the court is induced to order that the paper be produced, or the cause be continued. In regard to the secrecy of these parts which it is stated are improper to give out to the world, the court will take any order that may be necessary. I do not think that the accused ought to be prohibited from seeing the letter; but, if it should be thought proper, I will order that no copy of it be taken for public exhibition, and that no use shall be made of it but what is necessarily attached to the case. After the accused has seen it, it will yet be a question whether it shall go to the jury or not. That question cannot be decided now, because the court cannot say whether those particular passages are of the nature which are specified. All that the court can do is to order that no copy shall be taken; and if it is necessary to debate it in public, those who take notes may be directed not to insert any part of the arguments on that subject. I believe, myself, that a great deal of the suspicion which has been excited will be diminished by the exhibition of this paper.

The above quotations from the letter of President Jefferson and from the opinion of the Chief Justice of the United States indicate clearly the high plane upon which they felt matters of such delicacy should be handled; the mutual respect different branches of the Government should have for each other, and afford a striking example of the determination of the Executive and Judiciary branches of the Government to see that justice is done to all within the scope and confines of their respective departments without unduly encroaching one upon the other, which is worthy of emulation at all times when dealing with such delicate matters.

Thomas Jefferson stated the views of the Executive Department in the following clear and forceful language:

* * * The respect mutually due between the constituted authorities in their official intercourse, as well as sincere dispositions to do for every one what is just, will always insure from the executive, in exercising the duty of discrimination confided to him, the same candor and integrity to which the nation has, in like manner, trusted in the disposal of its judiciary authorities.

while Chief Justice Marshall issues the following solemn warning to those who would dare act otherwise:

* * * It ought not to be believed that the department which superintends prosecutions in criminal cases, would be inclined to withhold it. What ought to be done under such circumstances presents a delicate question, the discussion of which, it is hoped, will never be rendered necessary in this country.

Counsel for appellee, in support of his position, cites the case of *Boske* v. *Comingore*, 177 U. S. 459. This case involved the punishment of a collector of internal revenue for his failure to produce, under the order of the State court, certain evidence in his possession. As his authority for refusing the evidence the collector cited the regulations of the Treasury Department, which regulations are quite similar to those in effect on the date of the present importation.

However, in the *Boske* case there existed no statute making the records sought admissible in evidence. The regulations in question in the *Boske* case, as well as the regulations in question in the present case, were issued by the Treasury Department under specific authority from the Congress which in effect authorized the Treasury Department to issue such regulations, *not inconsistent with law*, as were necessary for the operation of the department.

Section 501 of the Tariff Act of 1930, in effect when the regulations here involved were issued, provides, in part, that:

* * * In finding such value * * * reports or depositions of consuls, customs agents, * * * may be admitted in evidence.

Here, in very precise language, the Congress has declared that special agents' reports may be admitted in evidence in the trial of reappraisement cases, and any regulation of the Treasury Department which attempted to prohibit the introduction in evidence of such reports would be inconsistent with such law. There is nothing in the law, above quoted, to indicate that the Congress intended that only such special agents' reports as were favorable to the Government, or such as were offered by the Government might be admitted in evidence. Nor does the statute limit the reports to be admitted in evidence to those concerning which the Secretary of the Treasury has not indicated that they contain matter the disclosure of which would be inimical to the public interest. However, since this question is not squarely presented in this case, I shall express no further opinion upon the same. What has been said is sufficient to show that the *Boske* case, *supra*, does not support the position of appellee herein.

When this report was first called for at the trial of this case, it should be noted that counsel for the Government, in whose possession the report then reposed, stated: "I am not saying that I may not offer it of my own volition * * * I may decide to offer it myself, after I see how far, how much of a case he has, * * *." From these remarks it is quite apparent that, in the opinion of counsel for the Government, this report did not contain any matter the disclosure of which would be inimical to the public interest. It therefore appears that this report had been sent by the Treasury Department to the attorney for the Government without any suggestion of any kind that the report contained any matter the disclosure of which would be inimical to the public interest. Just what change took place in the report between the time the Treasury Department forwarded the same to the attorney for the Government and June 5, 1942, and also between the time counsel for the Government suggested that he might offer it in evidence himself and June 5, 1942, which would cause the disclosure of its contents to be inimical to the public interest, the record is completely silent.

In *Kilbourn* v. *Thompson*, 103 U. S. 169 (at p. 190) the Supreme Court of the United States, speaking through Mr. Justice Miller, said:

It is believed to be one of the chief merits of the American system of written constitutional law, that all the powers intrusted to government, whether State or national, are divided into the three grand departments, the executive, the legislative, and the judicial. That the functions appropriate to each of these branches of government shall be vested in a separate body of public servants, and that the perfection of the system requires that the lines which separate and divide these departments shall be broadly and clearly defined. It is also essential to the successful working of this system that the persons intrusted with power in any one of these branches shall not be permitted to encroach upon the powers confided to the others, but that each shall by the law of its creation be limited to the exercise of the powers appropriate to its own department and no other.  *  *  *

In Appeal of Hartranft, 85 Pa. 433 (at p. 445) the court said:

*  *  *  We had better at the outstart recognize the fact, that the executive department is a coordinate branch of the government, with power to judge what should or should not be done, within its own department, and what of its own doings and communications should or should not be kept secret, and that with it, in the exercise of these constitutional powers, the courts have no more right to interfere, than has the executive, under like conditions, to interfere with the courts.

It ought not to be believed that the department which superintends the procurement of these special agents' reports would ever be inclined to withhold from the courts any information contained in such reports which would assist the courts in determining the value of the merchandise covered by such reports. What ought to be done under such circumstances presents a delicate question, the discussion of which, it is hoped, will never be rendered necessary in this country.

Based entirely upon the statement in the letter from the Treasury Department, dated June 5, 1942, with reference to the contents of this report that "their disclosure at this time pursuant to the subpoena would be inimical to the public interest," and following the cited and quoted authorities, I find no error in the action of the trial court in granting the motion to quash the subpoena.

Turning to the primary question of finding a value for the involved merchandise, I am in accord with the finding of the trial court "*  *  * that such values were, in each case, the appraised values,  *  *  *" but with the finding of the trial court as to what constitutes the appraised values, I am in disagreement. On the appraisement sheet, signed by an assistant appraiser and a deputy appraiser, under the heading "Appraised," appears the following: "Adv." On the invoice covered by reappraisement No. 134747–A the following appears in red ink:

*Appr. Basis:*

Items ⊗ above at units checked in red, Less 15% discount, plus 7.4% taxes, plus packing.  FMV

Items ⊞ above at units checked in red, Plus 7.4% taxes, plus packing. FMV

Items ⊗ and ⊞ appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis.

Four of the items appearing upon this invoice are marked "not sold in Austria." These four items were appraised at their United States value, and concerning these there is no question before us. All the other items are marked either ⊗ or ⊞. Five red-ink circles are drawn around that many groups of the invoice prices and in each circle appears in red ink the words "A. Sch" or "A. Sch per 100 pc," and each of the invoice prices has a red-ink check mark opposite it.

On the invoice covered by reappraisement No. 134744–A the following appears in red ink:

Appraisal basis (F. M. V.) at 6.20 Austrian Schillings
Plus 10% for thinness on 1/32" only
Less 0.20 A. Sch per Kilo rebate
Less quantity discount 2%, less bonus 10%
Plus turnover tax 3.7% and crisis tax 3.7%
Plus packing.
Appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis. Adv F. M. V.

As to the values found by the appraiser in Austrian schillings appellant makes no complaint, but appellant does contend that when the appraiser "Appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis," he was attempting to convert the currency and that this is the exclusive function of the collector. In this connection the trial court stated:

As to the values returned in Austrian Schillings the plaintiff makes no complaint, but it is contended that in making the above-quoted statement the appraiser was attempting to convert currency, which is a function of the collector, and not of the appraiser, * * *.

It is clear from the above quotation that the trial court recognized the fact that the appraiser had found values for this merchandise in Austrian schillings. The fact that the appraiser did find values for the merchandise in Austrian schillings is fully confirmed by the record. And yet the trial court states that:

It is clear that the appraisements made in the cases in question were in German Reichsmarks. * * *

Of course it is recognized that the appraiser cannot find values for the same merchandise in both Austrian schillings and German reichsmarks. The value of merchandise "* * * shall be expressed in the currency of the country of exportation in which merchandise identical with or similar to that under appraisement is usually bought and sold in the ordinary course of trade, notwithstanding that two or

more currencies of different character may circulate in that country"ʳ (Article 776 (b), Customs Regulations of 1937).

It is my view that the action of the appraiser in this case, as set out above, down to and including the words "plus packing" constituted a full and complete and perfectly legal appraisement, and in doing this he expressed the values found by him in Austrian schillings. Thus impliedly the appraiser found that Austria was the country of exportation, or that Austrian schillings was the currency of the country of exportation, although Austria was actually absorbed into the German Reich on March 15, 1938, in which identical or similar merchandise is usually bought and sold in the ordinary course of trade, notwithstanding the fact that the appraiser might have found that the German reichsmark was also circulating in that country at that time.

At this point I wish to insert the following in reply to the argument and reasoning of my associates concerning the applicability of subparagraph (e), article 776 of the Customs Regulations of 1937:

After quoting subparagraph (e) of the Customs Regulations of 1937, my associates state:

> The italicized language in the above quotation clearly discloses that under certain conditions it is incumbent upon the appraiser to convert different currencies "for the purpose of comparison" as above indicated, and his action in ascertaining, estimating, and appraising merchandise, to the extent that his processes involve the conversion of currency, is legal.

Under the above regulation the appraiser is authorized to convert a foreign currency "into *United States currency* at the rate certified by the Federal Reserve bank for the date of exportation of the merchandise involved," and then only "When merchandise identical with or similar to that under appraisement is sold for domestic consumption and for exportation in different currencies in the country of exportation * * *." [Italics mine.]

As I understand it no one is contending in this case that the appraiser does not have authority to convert currency as directed in the above regulation, but the trouble with the reasoning of my associates is that *in this case the appraiser did not convert the foreign currency into United States currency*, as authorized by said regulation, *but on the contrary, converted one foreign currency, Austrian schillings, into another foreign currency, German reichsmarks*. Certainly the Federal Reserve bank never certified the rate of one reichsmark equals 1.50 Austrian schillings, as used by the appraiser in making his conversion in this case. Neither the law itself nor the regulations promulgated thereunder contain any provision authorizing the appraiser to convert Austrian schillings into reichsmarks, or to convert any foreign currency into another foreign currency. Therefore, the action of the appraiser in converting Austrian schillings into reichsmarks was

without authority, either of law or regulations, and as such was extra-official and of no effect.

There is nothing novel about accepting those acts of the appraiser made and done within his authority and in disregarding those acts of the appraiser which are not made and done within his authority. The former acts are presumptively correct, while the latter acts are without any force or effect.

It is clear to me that the act of the appraiser in converting Austrian schillings into German reichsmarks at the ratio of one reichsmark equals 1.50 Austrian schillings was not authorized by law or regulations, was beyond the scope of his authority, forms no part of his appraisement, and should be given no consideration by us in this case. In the light of the foregoing, the reasoning of my associates that article 776 of the Customs Regulations of 1937 authorizes the appraiser to convert currency "for the purpose of comparison," clearly appears to be unsound. The conversion of currency made in this case neither gives nor leaves the appraiser anything for "comparison."

The following is the remainder of my original opinion:

Once the appraiser found that Austrian schillings was the currency of the country of exportation in which identical or similar merchandise is usually bought and sold in the ordinary course of trade, it was his duty to express the values found by him in Austrian schillings. This he clearly did, and there was no reason for him to attempt to convert these Austrian schillings into German reichsmarks. This is clearly the function of the collector. *Sabine Transportation Co.* v. *United States*, 1 Cust. Ct. 641, Reap. Dec. 4409; *United States* v. *Tower*, 8 Cust. Ct. 681, Reap. Dec. 5615, and *Giovanni Ascione* v. *United States*, T. D. 37252, G. A. 8077.

If the appraiser had found that the invoice prices expressed in Austrian schillings, and checked by him in red ink, did not represent the correct foreign market value of the merchandise, he had a perfect right, and it was his duty, to find and express the correct foreign market value. In reappraisement No. 134747–A the appraiser found the foreign market value as to the items he marked Ⓧ to be the invoice prices, expressed in Austrian schillings, checked by him in red ink, less 15 per centum discount, plus 7.4 per centum taxes, plus packing, and as to the items he marked Ⓔ he found the foreign market value to be the invoice prices, expressed in Austrian schillings, plus 7.4 per centum taxes, plus packing. Had the appraiser not accepted the invoice prices expressed in Austrian schillings, over which in red ink he marked "A. Sch.," he would have had no figure from which he could have subtracted the 15 per centum discount and to which he could have added 7.4 per centum taxes, plus packing.

In reappraisement No. 134744–A the appraiser definitely appraised the merchandise at "6.20 *Austrian Schillings*, plus 10% for thinness on ⅛₂" only, less 0.20 A. Sch. per kilo rebate, less quantity discount 2%, less bonus 10%, plus turnover tax 3.7% and crisis tax 3.7%, plus packing." This was a complete appraisement and carried with it a definite finding by the appraiser that the currency of the country of exportation in which identical or similar merchandise was usually bought and sold in the ordinary course of trade was *Austrian schillings*. Any further action on the part of the appraiser was contrary to the customs regulations, without warrant of law, and, therefore, void.

As heretofore stated, the action of the appraiser in reappraisement No. 134747–A in appraising items marked ⊗ on the invoice at the units checked in red, less 15 per centum discount, plus 7.4 per centum taxes, plus packing, and the items marked ⊕ on the invoice at the units checked in red, plus 7.4 per centum taxes, plus packing, and his action in reappraisement No. 134744–A in appraising the merchandise at 6.20 Austrian schillings, plus 10 per centum for thinness on one thirty-second of an inch only, less 0.20 A. Sch. per kilo rebate, less quantity discount 2 per centum, less bonus 10 per centum, plus turnover tax 3.7 per centum and crisis tax 3.7 per centum, plus packing, constituted complete and legal appraisements, and the values thus found by the appraiser are, under section 501 of the Tariff Act of 1930, presumptively correct. Since the record contains nothing to overcome the presumptively correct values set out above, they should be held to be the proper dutiable foreign values of the merchandise.