UNITED STATES *v.* GOTHIC WATCH CO.

No. 7712.—

Entry No. 718904.

Third Division, Appellate Term

(Decided June 28, 1949)

*David N. Edelstein*, Assistant Attorney General (*Michael Stramiello, Jr.*, and *John J. Antus*, special attorneys), for the appellant.

*James W. Bevans* (*James W. Bevans* of counsel, *William Fox*, associate counsel) for the appellee.

*Edward K. Kennedy, amicus curiae.*

Before CLINE, OLIVER, and COLE, Judges

CLINE, Judge: This is an application for review of a decision rendered by a single judge of the United States Customs Court in an appeal for reappraisement challenging the legality of the appraiser's action in attempting to reappraise the imported merchandise.

The merchandise consisted of wrist watches, imported from Switzerland on or about December 20, 1943. The following facts are established by a stipulation of the parties and the oral and documentary evidence herein. The merchandise was entered on December 28, 1943, and thereafter the invoice and a form entitled "Summary of Exami-

nation and Appraisement" were transmitted to the appraiser for the purpose of appraisement. The total invoice value was 4,455.15 Swiss francs, paper currency. The value entered on the summary sheet is 4,416.80 Swiss francs at 233060 [apparently $0.233060 (compare defendant's exhibit 4)] or $1,029.38.

The invoice and summary sheet were returned to the collector on or about January 7, 1944. At that time there appeared thereon a check mark (✓) in red ink under the column headed "appraised" and in the column entitled "Examiner and Date of Examination" the initials "M. H." and the date "12/31/43." The instructions on the summary sheet provide that a check mark in the column marked "Appraised" indicates that "the appraised value agrees with the entered value as represented by the information set forth on the invoice and in any importer's notations endorsed thereon or attached thereto." The paper was signed by Assistant Appraiser H. H. Crum and stamped "Approved Jan 6 1944 John H. Flynn Appraiser."

Thereafter, at some time between the months of March and May 1946, pursuant to certain instructions of the Bureau of Customs published as T. D. 51398, the invoice and accompanying papers were again sent by the collector to the appraiser and were subsequently returned on or about June 24, 1946. At that time the red check mark (✓) in the column entitled "Appraised" on the summary sheet, together with the stamped approval, date, and signature of the appraiser, had been stricken out and marked "Void H. H. C. 6/18/46" and new notations in red ink had been made thereon. In the column marked "Appraised" there was noted "Adv. H. H. C. 6/18/46" and across the face of the summary sheet there was stamped "Appraised in Free Swiss Francs (T. D. 51398)" and the report was signed in ink by John H. Flynn, appraiser, and dated June 18, 1946.

A notation that had previously been entered in the collector's official record of invoices returned by the appraiser was stricken out in lead pencil and the notation "June 26, 1946 Adv. V." entered, indicating that the appraised value of the merchandise was higher than the entered value. Accordingly, a written notice of appraisement was given by the collector and an appeal for reappraisement was taken by the importer.

Morris Halperin, examiner of merchandise, testified that the appraisement of January 6, 1944, was in Swiss francs; that in the early part of 1944 he became aware that there were two different rates of exchange for Swiss francs, but that he had no official notice of that fact; that he appraised in Swiss francs and was not concerned with the rate of exchange.

Henry H. Crum, assistant appraiser, testified that he and Mr. Halperin were satisfied that the unit value in Swiss francs, whatever the rate of exchange, was correctly stated on the invoice and entry;

that after he had approved the examiner's action and affixed the stamp of the appraiser, the invoice and summary sheet were sent to the collector's office; that they were subsequently returned pursuant to T. D. 51398; that in making the report of June 18, 1946, he did not exercise any discretion but followed the instructions in T. D. 51398; that the advance in value in that return was due to the change of appraisement from a franc that carried one conversion rate to a franc that carried a higher conversion rate.

George E. Berge, chief liquidator, testified that liquidation could not have been made as of the date the summary sheet was received by him before any change had been made because the collector was not in possession of a rate of exchange certified by the Federal Reserve bank for the date of exportation; that no rate had been proclaimed by the Director of the Mint for Swiss francs for the quarter in which the date of exportation herein fell; that when he received the papers he assumed there had been a valid appraisement and sought to find an exchange rate for the Swiss franc; that in the normal course where he did not find a daily rate, he would suspend liquidation until he got it; that liquidation of the entry herein was withheld under instructions from the Bureau of Customs; that if he had received no instructions and had received a rate of exchange, he would have liquidated, and if he had received two rates, he would have asked the appraiser which rate governed; that asking the appraiser which rate he adopted does not necessitate a reappraisement.

T. D. 51398, issued by the Commissioner of Customs and approved by the Acting Secretary of the Treasury on January 28, 1946, states that the Federal Reserve bank has certified or will certify two daily buying rates for the Swiss franc for the dates from August 2, 1943, to June 30, 1944, inclusive, the higher to be designated "free" and the lower "official," and that the appropriate certified rate must be used for customs purposes in all cases in which a conversion rate for any of those dates is required. The reason for the two rates is explained in the T. D. as follows:

By Executive Order No. 8785 of June 14, 1941, there was a general blocking of all continental European credits in the United States. Soon after the issuance of that Executive order, the Swiss Government limited the blocked United States dollars which would be accepted at the official rate to those blocked dollars obtained in payment of exports. Some time later, by regulation effective August 1, 1943, the Swiss Government placed a limit upon the amount of blocked dollars which could be converted at the official rate in payment of exports of Swiss clocks, watches, or parts, movements, or cases thereof. Under the regulation there were established individual quotas up to which the Swiss National Bank was authorized to accept blocked dollars from manufacturers or exporters each month in payment for clocks, watches, or parts, movements, or cases thereof, when intended for export to those countries which normally paid in United States dollars, i. e., the United States and certain other countries. Blocked dollars were accepted at the official rate in payment for unlimited exports of other commodities.

However, exports of clocks, watches, or parts, movements, or cases thereof in excess of the established quotas were not prohibited, provided the exporter exceeding his quota obtained payment for the excess exportation in Swiss francs acquired at the free rate of exchange or in blocked dollars convertible at the free rate, and many such excess exports actually were imported directly or indirectly into the United States.

Accordingly, the T. D. holds that the free rate is the proper rate for imports of clocks, watches, or parts, movements, or cases thereof, and the official rate is the proper one for all other imports. The T. D. states that where appraisements of merchandise imported between August 2, 1943, and June 30, 1944, have been made in terms of "Swiss francs," such action was based upon incomplete information as to material facts necessary to a valid appraisement and directs collectors to return the invoices and accompanying papers in such cases to the appraisers, who shall then appraise the merchandise, indicating the class of currency in which the appraised value is expressed.

It is contended by the importer herein that the merchandise was lawfully appraised on January 6, 1944, and that the attempt to reappraise the merchandise was illegal, null, and void, there having been no appeal taken by the collector from the original appraisement. The Government contends, however, that the original appraisement was incomplete in that it did not give the information necessary for liquidation by not giving a value in a currency which is accepted for customs purposes; that a currency does not exist for customs purposes until a value has been proclaimed by the Director of the Mint or certified by the Federal Reserve bank; that an appraisement in such a currency has no meaning, unless a value has been previously proclaimed or certified; that therefore the original appraisement herein was void; that the collector is not required to file an appeal for reappraisement from a void appraisement; and that the second appraisement is valid.

In a well-considered opinion it was held by the single judge that the attempted appraisement on June 18, 1946, was illegal, null, and void, and that the return of value which approved the entered value as reported by the appraiser on January 6, 1944, constituted the statutory appraisement of the importation, and that in the absence of an appeal therefrom it became final 60 days after the date of the appraiser's report and formed the basis for the assessment of duties. *Gothic Watch Co.* v. *United States*, 19 Cust. Ct. 309, Reap. Dec. 7438.

Section 14.3 (*f*) of the Customs Regulations of 1943 provides:

The report of the appraiser as to value shall not be reconsidered or modified by him after the appraised invoice and report of appraisement has been lodged with the collector, but within 60 days thereafter an appeal for reappraisement may be filed by the collector if he believes the appraisement is incorrect.

It is also well settled by the authorities that an appraisement is complete and subject to no further change when it has been physically transmitted to and lodged with the collector. *Igstaedter & Co.* v. *United States*, 11 Ct. Cust. Appls. 477, T. D. 39570; *Ringk & Co.* v. *United States*, 12 Ct. Cust. Appls. 40, T. D. 39980; *United States* v. *Dorn & Co.*, 13 Ct. Cust. Appls. 130, T. D. 40961; *F. W. Myers & Co.* v. *United States*, 36 Treas. Dec. 194, T. D. 37934; *Ainslee Knitting Machine Co., Inc.* v. *United States*, 69 Treas. Dec. 954, T. D. 48339.

In *Ringk & Co.* v. *United States, supra,* the merchandise was entered at 13,354.18 yen, although the consular invoice stated the gross value to be 14,760.10 Peiyang dollars, which, after deducting nondutiable charges, would amount to 13,354.18 Peiyang dollars. The appraiser approved the valuation given in the entry and officially reported that fact to the collector. No appeal was taken for a reappraisement. Subsequently, the collector transmitted the report to the appraiser with a notation calling his attention to the fact that the invoice was in Peiyang dollars and not in yen. Thereupon, the acting appraiser returned the report indorsed as follows: "Collector, this office amends return to read currency as P. Y. $." Liquidation on the basis of the amended return was protested and it was held that the subsequent attempt to amend was unauthorized; that if the collector was dissatisfied he was entitled to appeal for a reappraisement, but that after the time allowed for such appeal had elapsed, the appraisement became final and the collector was bound to liquidate accordingly.

It is claimed in the instant case, however, that the report of January 6, 1944, was incomplete and illegal and that it was not necessary for the collector to take an appeal for reappraisement from a void report. Assuming it were void, did the collector have the authority to make that determination? Section 501 of the Tariff Act of 1930, as amended by the Customs Administrative Act of 1938, provides:

\* \* \* The decision of the appraiser shall be final and conclusive upon all parties unless a written appeal for a reappraisement is filed with or mailed to the United States Customs Court by the collector within sixty days after the date of the appraiser's report, or filed by the consignee or his agent with the collector within thirty days after the date of personal delivery, or if mailed the date of mailing of written notice of appraisement to the consignee, his agent, or his attorney. \* \* \*

Thus an orderly process has been provided for challenging the appraiser's action. Neither party may take it upon himself to declare the appraisement illegal or void. That is a matter for the courts. Appellant has cited many cases in which the legality of appraisements has been involved, but in all of them it was not the collector but the court which determined the question. *United States* v. *Passavant*, 169 U. S. 16; *United States* v. *F. W. Woolworth Co.*, 22

C. C. P. A. 184, T. D. 47126; *United States* v. *V. W. Davis, Sinai Kosher Sausage Factory*, 20 C. C. P. A. 305, T. D. 46087; *United States* v. *Gilson Bros.*, 20 C. C. P. A. 117, T. D. 45753; *United States* v. *William Prym of America (Inc.)*, 17 C. C. P. A. 180, T. D. 43475; *United States* v. *Tampa Box Co.*, 15 Ct. Cust. Appls. 360, T. D. 42561; *Klingerit, Inc.* v. *United States*, 14 Cust. Ct. 435, Reap. Dec. 6159; *United States* v. *Sontag's Shoe Stores*, 14 Cust. Ct. 314, Reap. Dec. 6091; *Mitsubishi Shoji Kaisha, Ltd.* v. *United States*, 2 Cust. Ct. 935, Reap. Dec. 4570; *Independent Forwarding Co. (Inc.)* v. *United States*, 60 Treas. Dec. 757, T. D. 45237, decided on rehearing in 61 Treas. Dec. 1634, Abstract 20023; *United States* v. *Alex. Murphy & Co.*, 55 Treas. Dec. 273, T. D. 43210.

We know of no case, nor has any been drawn to our attention, which holds that the appraiser's action, even though erroneous or invalid, may be disregarded or declared void by either party without resort to the judicial forum. In all such cases, the appraisement is final and conclusive on all parties, whether valid or invalid, unless the statutory procedure for challenging its legality is followed.

It is argued, however, that the report of January 6, 1944, was incomplete and that therefore the collector could return it for completion. The report appeared complete on its face and the liquidator testified that when he first received it, he assumed that it was a valid appraisement, and that he did not liquidate because he did not have an exchange rate for the Swiss franc and because of instructions from the Bureau of Customs to withhold liquidation.

The Government's contention seems to be based upon the premise that an appraisement cannot be complete or valid unless a value for the foreign currency has been *previously* proclaimed by the Director of the Mint or certified by the Federal Reserve bank. We do not so read the statutes or the regulations issued thereunder.

It is the duty of the appraiser to find the value of the merchandise in the unit of quantity in which the merchandise is usually bought and sold and to express such value in that currency of the country of exportation in which such or similar merchandise is usually bought and sold in the ordinary course of trade in such country. (Section 500, Tariff Act of 1930; section 14.2 (e) and (f), Customs Manual of 1943.) Therefore, if the merchandise was usually bought and sold in a currency for which no value had been proclaimed or certified, the appraiser would nevertheless have to appraise in terms of that currency and it would be the duty of other agencies of the Government to establish the value of that currency in United States funds. The only time the appraiser has anything to do with conversion of the currency is when the merchandise is sold in different currencies in the country of exportation, in which case conversion may be made for purposes of comparison. (*Klingerit, Inc.* v. *United States*, 14 Cust.

Ct. 435, Reap. Dec. 6159; section 14.2 (h), Customs Manual of 1943.) Otherwise, the only currency question for determination by the appraiser is how many units of the currency in which the goods are appraised are necessary to make market value on the date of exportation. (Section 14.2 (i), Customs Manual of 1943.) In other words, it is the duty of the appraiser to value the goods as of the time of exportation in the currency of the country from which they are imported and it is the duty of the collector to convert that valuation into United States currency at the proclaimed or certified rate. *Masson* v. *United States*, 1 Ct. Cust. Appls. 149, T. D. 31209. Note also *Giovanni Ascione* v. *United States*, 32 Treas. Dec. 725, T. D. 37252, where the court said (p. 729):

\* \* \* The appraiser in arriving at the value has nothing to do with the conversion of money at any time or any part of the proceeding. He must find the value of the merchandise in the ordinary course of trade in the country of exportation in the currency used by the people of that country. No fine-spun theory as to depreciated currency is within his jurisdiction whatever. There is another officer who will take care of that proposition.

In the instant case there is no evidence that the merchandise was bought and sold in Switzerland in more than one currency. The currency used was Swiss francs in all cases, the only difference being that the Swiss francs were bought at different rates of exchange. The appraiser's report of January 6, 1944, therefore complied with the regulations in appraising the merchandise as entered in Swiss francs. It was then the duty of the collector to ascertain the value of said Swiss francs in American currency in accordance with the rates proclaimed by the Director of the Mint or certified by the Federal Reserve bank. In cases where a rate has not been certified, the collector is directed to request a rate from the Customs Information Exchange. (Section 16.4, Customs Manual of 1943.)

In *Barr* v. *United States*, 324 U. S. 83, the invoice was made out in pounds sterling and for the purpose of assessment of duty it was necessary for the collector to convert the pounds sterling into United States currency. The Federal Reserve bank had certified a "free" and an "official" rate of exchange but the Secretary of the Treasury had published only the official rate and had directed collectors to use that rate in assessing and collecting duties. It was held that under the circumstances of that case, the collector should have used the "free" rate. The implication to be drawn from that holding is that it is the duty of the collector to select which rate of exchange is applicable. See also *John Barr* v. *United States*, 35 C. C. P. A. 1, C. A. D. 362; *The Otto Gerdau Co.* v. *United States*, 21 Cust. Ct. 24, C. D. 1120; *Mamary Bros., Inc.* v. *United States*, 21 Cust. Ct. 135, C. D. 1142. In all of these cases the courts realized that the rate selected would affect the valuation of the merchandise for customs purposes,

and it was held that the rate used should be the one which gave the closest approximation to the value in dollars of the imported merchandise. The fact that valuation was involved did not mean that the rate must be selected by the *appraiser*.

We conclude, therefore, that the report of the appraiser, dated January 6, 1944, was complete and legal, and since no appeal for a reappraisement was taken therefrom within the time provided by statute, it is final and conclusive on all parties. (Section 501, Tariff Act of 1930, as amended by the Customs Administrative Act of 1938.)

The judgment of the trial court that "the attempted reappraisement embodied in the return of value by the appraiser in his report to the collector dated June 18, 1946, was illegal, null and void, and that the appraiser's return of value in his report to the collector of customs dated January 6, 1944, which approved the entered value constituted his appraisal of the merchandise pursuant to section 501 of the Tariff Act of 1930 and was final and conclusive in the absence of an appeal" is affirmed. Judgment will be rendered accordingly.