(C. D. 1467)

OxFORD UNIVERSITY PRESS, NEW YORK, INC. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided October 7, 1952)

*Lane, Young & Fox* (*William H. Fox* and *William Whynman* of counsel) for the plaintiff.
*Charles J. Wagner*, Acting Assistant Attorney General (*Dorothy C. Bennett*, special attorney), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges; CLINE, J., not participating

EKWALL, Judge: This action against the United States is directed against the collector's conversion of foreign currency into United States dollars.

The merchandise involved herein consists of bound books described on the invoice (defendant's exhibit 4) as "6000 Impressionisten Am. ed.," and certain color plates and wrappers for the books, invoiced at Vienna, Germany, on June 18, 1938, and exported from Hamburg, Germany, on June 22, 1938. The record discloses that on the date of exportation Austria had become a part of Germany.

It is claimed in the original protest that the collector's method of converting the currency of the invoice (Austrian schillings) into United States currency was erroneous and illegal. In an amendment to the protest, it is claimed that the merchandise was entered and appraised in United States dollars; that, therefore, no conversion of currency was necessary or proper; and that the entry should be reliquidated on the final appraised value in United States dollars.

The Government contends that the books were entered and appraised in Austrian schillings, and the color plates and wrappers in English pounds sterling, and that the collector properly converted such currencies in the manner provided in section 522 of the Tariff Act of 1930.

At the trial, three witnesses testified on behalf of the plaintiff: Norman E. Thompson, an employee of the plaintiff corporation; Raymond Lund, vice president of M. Farris & Co., Inc., customhouse broker; and John J. Smith, of the protest review section in the office of the collector of customs. Plaintiff introduced into evidence a declaration signed by Mr. Thompson, dated November 30, 1938 (plaintiff's exhibit 1), and a copy of a contract between plaintiff and Phaidon Verlag, dated July 7, 1937 (plaintiff's exhibit 6).

Defendant introduced the following documents into evidence:

A letter to plaintiff from George Allen & Unwin, Ltd., dated April 29, 1941 (defendant's exhibit 2).

The importer's work sheet attached to the consular invoice (defendant's exhibit 3).

The commercial invoice of the books from George Allen & Unwin, Ltd. (defendant's exhibit 4).

The commercial invoice of the color plates and wrappers from George Allen & Unwin, Ltd. (defendant's exhibit 5).

The collector's letter of transmittal which is identified as "Memorandum re Protest No. 7633" (defendant's exhibit 7).

Photostatic copies of two letters from the Commissioner of Customs, dated December 13, 1940, and October 13, 1942, respectively (defendant's collective exhibit 8).

A collective exhibit including copies and translations of certain decrees of the German Government, together with a copy of a memorandum on the status of the Austrian schilling after the Anschluss (defendant's collective exhibit 9).

From this evidence it appears that a contract was made by plaintiff and Phaidon Verlag on or about July 7, 1937, under which plaintiff received the sole selling rights in the United States of the works of Phaidon Verlag printed in English in the fields of art and the history of civilization (plaintiff's exhibit 6). The price of each book was to be $1.45, inclusive of freight, duty, binding, and jackets, and payments were to be made in dollars. The contract was to be in force for 18 months.

Subsequent to the date of the contract and during the month of March 1938, German forces entered the Republic of Austria, and the latter ceased to exist as an independent state and became incorporated into the territory of Germany. (T. D. 49503, T. D. 50029.) Mr. Thompson testified that thereafter Phaidon Verlag left Vienna, seeking asylum in Great Britain, and George Allen & Unwin, Ltd., became its agent.

The consular invoice states that the instant merchandise was purchased by plaintiff from George Allen & Unwin, Ltd., as per order accepted in London on February 16, 1938. The consular certificate is dated June 18, 1938, at Vienna, Germany, and the merchandise was shipped from Hamburg, Germany, on June 22, 1938.

The purchase price of the 6,000 books was $1.45 per volume, making a total of $8,700 for the shipment, including freight, insurance, and duty. There was no charge for the color plates and wrappers, and no question in regard to them is involved herein. According to plaintiff's declaration (plaintiff's exhibit 1), the currency of purchase was dollars, and $6,814.91 was remitted in full payment for the merchandise. It is stated in plaintiff's brief and not disputed by defendant that the actual freight charges were $724.89, and duty and nondutiable items were estimated to be $1,160.20, making a total of $1,885.09. Deducting this amount from the gross price of $8,700 results in the sum of $6,814.91, the amount paid by the plaintiff for the purchase.

Mr. Lund testified that he supervised the preparation of the entry herein and that it was made on the basis of home market value

according to United States dollars.   The following figures appear on the consumption entry:

$8700. 00

Less Chgs. _____ 31. 50

$8668. 50

Deduct to make M. V. _____ 1119. 75

$7548. 75

Add to make M. V. _____ 25. 00[1]

$7573. 75————$7574.

On the importer's work sheet attached to the consular invoice (defendant's exhibit 3) the following explanation is made:

Deduct to make market Value.

Deduct to make Market Value to equal
Aus. Sch. 12.00 less 45% per Volume.
6000 vols. @ 6.60—Aus. Sch. _____ 39600. 00
     @ .188933_____ $7481. 75
     Plus cases_____ $ 67. 00

$7548. 75
Invoiced_____ $8668. 50

Deduct_____ $1119. 75

Add to make Market Value.

Add for items not extended
Add £5.0.0. @ 4.970486_____ $25. 00[1]

Add $25.00

Mr. Lund stated that he obtained the information for the deduction to make market value from the commercial invoice of George Allen & Unwin, Ltd. (defendant's exhibit 4).   The following notation appears thereon:

Home market value_____A. S.   12. —
45% discount_____ 5. 40

A. S.   6. 60

Mr. Lund testified as follows in regard to the work sheet:

X Q.   Well, when you filed the work sheet, Exhibit #3, you entered it on the basis of foreign value, is that correct?—A.   The equivalent at the current rate of exchange.

    *      *      *      *      *      *      *

X Q.   You had the work sheet, Exhibit #3 prepared and filed with the entry, didn't you?—A.   Yes.

X Q.   In explanation of the entered value?—A.   Right.

---

[1] The $25 item in the entry and the work sheet is the value of the color plates and wrappers.   No question is raised as to this item.

X Q. And on that work sheet you deducted from the consular invoice total dollar value to equal that home market value net Austrian schillings 6.60, is that correct?—A. Yes, at the current rate of exchange at that time.

Mr. Lund testified further that he was not advised that the rate of exchange used ($0.188933 per schilling) was an agreed rate of exchange for the transaction and that he did not notice a statement on the consular invoice that "These goods are sold for consumption in Germany at Rmk. 4.40 for one book."

Mr. Lund was unable to say just how he obtained the rate of conversion used beyond stating that it was his practice to obtain rates from published Treasury Decisions or customs officials. It appears, however, that the rate used was published in T. D. 49457, under date of March 12, 1938, and that it is the last exchange rate that was published in the Treasury Decisions for the Austrian schilling. From correspondence among the official papers and in defendant's collective exhibit 8, it appears that the Federal Reserve bank certified rates for the Austrian schilling for dates up to June 13, 1938, but not thereafter.

The appraiser's report in connection with the entry herein contains a check mark in the column headed "Appraised," indicating that the merchandise was appraised as entered.

On liquidation, the collector converted the Austrian schillings mentioned in the work sheet at the rate of $0.268504 per schilling. How the rate was obtained is explained in the collector's letter of transmittal (defendant's exhibit 7):

The Bureau of Customs in its letter dated December 13, 1940, copy of which is attached to entry, stated that a 3:2 ratio had been set up by the German authorities as the relationship between the Austrian schilling and the reichsmark, and expressed the opinion that the collector would be justified in converting the Austrian currency into United States money on the basis of the aforementioned ratio.

As there was no proclaimed rate for the Austrian schilling for the quarter beginning April 1st, 1938, and as no certified rate for that currency was available, the collector used $0.268504 based on $0.402756 (the value of the mark on June 22, 1938) and the ratio already referred to.

\* \* \* \* \* \* \*

$$3 \; : \; 2 \; :: \; .402756 \; : \; x$$

$$\frac{2x.402756}{3} = .268504$$

Defendant's collective exhibit 9 includes translations of certain decrees of the German Government issued in connection with Austrian currency. The decree of March 17, 1938, provided that the reichsmark was legal tender in the province of Austria and that 1 reichsmark was equal to one schilling and 50 groschen. The decree of April 23, 1938, provided that the note-issuing privilege of the Austrian National Bank be discontinued; that notes of said bank cease to be legal tender from April 25, 1938; that said notes would be redeemed against means of payment expressed in reichsmarks in the ratio of 3

schillings to 2 reichsmarks; that said notes would be redeemed until December 31, 1938; and that token coins in schillings would remain legal tender until called in.

The first question to be considered is whether the entered value was in United States dollars or in Austrian schillings. It is clear that the transaction itself was in dollars, but since the entry is based on the home market value, which appears to have been higher than the purchase price, the currency actually paid by the plaintiff is immaterial.

Plaintiff claims that the merchandise was entered at a value in United States dollars ($7,548.75) which was equivalent to a foreign value in Austrian schillings converted into United States currency at the rate of $0.188933 per schilling. Plaintiff argues that if the importer had decided to enter the books at a value in Austrian schillings, the work sheet would have stated that the importer was abandoning the United States dollar price, as invoiced, and was entering at a foreign value in Austrian schillings as follows:

| | |
|---|---|
| 6000 volumes @ 6.60 each=A. S. | 39, 600. 00 |
| @ $0.188933= | $7, 481. 75 |
| Plus case and packing as invoiced | 67. 00 |
| | $7, 548. 75 |

However, it appears from the calculations in the entry and the work sheet that the importer was abandoning the invoice price which was in United States dollars and was entering at a different value. The calculation above is the same as that set forth in the work sheet.

Had the importer stated *in haec verba* that it was its intention to enter in United States dollar units, predicated on a unit of 6.60 Austrian schillings converted at $0.188933 per schilling, a different situation would have obtained. See *Gimbel Bros., Inc.* v. *United States*, 29 Cust. Ct. 5, C. D. 1435, decided June 26, 1952. The question here is whether such an intention can be spelled out of the papers passed upon by the appraising officers. Plaintiff points out that no mention of foreign currency appears upon the consumption entry itself or that portion of the summary sheet which is a copy thereof and claims that it is only in the official entry paper that an importer can declare the entered value of the goods.

In order to determine the entered value, we are not limited to a consideration of the document which is called the entry. The term "entry," in its broadest sense, includes all the transactions necessary to secure the release of the merchandise from customs control. (Art. 286 (a) (3), Customs Regulations of 1937.) Under that definition, it has been held that a consular invoice is a part of the consumption entry. *International Tobacco Co.* v. *United States*, 3 Cust. Ct. 181, C. D. 227 (modified on other grounds, 4 Cust. Ct. 15, C. D. 271.) In article 302 (c), Customs Regulations of 1937, it is provided that

"Additions to or deductions from the invoice value, together with the items to which they refer, shall be clearly shown in detail on the invoice or a statement attached thereto." It appears, therefore, that in order to determine what the entered value is, we may consider not only the consumption entry *per se*, but also the invoice and the work sheet attached thereto.

Defendant points out in its brief that it is an established rule of customs law that the terms "entered value" and "appraised value" refer to the unit entered value and the unit appraised value, as distinguished from the total values. *United States* v. *Kuttroff*, 9 Ct. Cust. Appls. 239, T. D. 38204; *United States* v. *Woodward-Newhouse Co.*, 11 Ct. Cust. Appls. 284, T. D. 39100; *Downing* v. *United States*, 11 Ct. Cust. Appls. 310, T. D. 39128; *Igstaedter* v. *United States*, 11 Ct. Cust. Appls. 477, T. D. 39570.

In *Downing* v. *United States, supra*, after quoting a provision of the Tariff Act of 1913 (a counterpart of which now appears in section 503 of the Tariff Act of 1930), prohibiting the assessment of duty on less than the entered value, the court said (p. 313):

This objection, however, finds an answer in the fact that the term "entered value," as used in the foregoing provision, signifies the unit of value and not the gross dutiable valuation given in the entry. In this case the unit of value was the price of the yarn per pound as given in the entry and confirmed by the appraisement of the local appraiser, and accordingly no less a price per pound could be adopted in finding the dutiable valuation of the merchandise for assessment.

The only unit value set forth in the entry papers involved herein is found on the importer's work sheet attached to the consular invoice, and the value given is 6.60 Austrian schillings per volume. This value was not converted into United States dollars nor is there any statement that the unit value is 6.60 Austrian schillings converted into United States dollars at a stated rate. Mr. Lund testified that the conversion rate of $0.188933 per schilling used in the work sheet was not an arbitrary or agreed rate of exchange. Therefore, it cannot be argued that conversion of the Austrian schilling at an agreed rate of exchange amounts to an entry in United States dollars.

Section 500 of the Tariff Act of 1930 provides that it shall be the duty of the appraiser under such rules and regulations as the Secretary of the Treasury may prescribe to appraise the merchandise in the unit of quantity in which it is usually bought and sold. Article 776, Customs Regulations of 1937, provides that the value returned by the appraiser shall be expressed in the currency in which merchandise identical with or similar to that under appraisement is usually bought and sold in the ordinary course of trade for home consumption or for exportation in the country of exportation, notwithstanding that two or more currencies of different character may circulate in the country. It is the duty of the appraiser to ascertain and return the unit value of the merchandise, rather than its total value. *Whittaker, Clarke &*

*Daniels, Inc.* v. *United States*, 34 C. C. P. A. (Customs) 164, C. A. D. 360. The presumption is that the appraiser has acted properly in the discharge of his duty. *United States* v. *F. W. Woolworth Co. et al.*, 22 C. C. P. A. (Customs) 184, T. D. 47126.

In the instant case, the appraiser's report indicates that the merchandise was appraised as entered. It is presumed that such appraisal was based on the unit value of the merchandise in the currency in which it was usually bought and sold for home consumption in the country of exportation. The unit value of 6.60 Austrian schillings set forth on the work sheet appears to meet these requirements. There is no evidence in the record that the merchandise was bought and sold for home consumption in the principal markets of Germany or Austria in United States dollars. On the contrary, the statement on the commercial invoice (defendant's exhibit 4) indicates that the home market value was expressed in Austrian schillings, and the statement on the consular invoice sets out such value in an equivalent amount of reichsmarks.

In view of all the facts and circumstances outlined above, we conclude that the merchandise herein was entered and appraised in Austrian schillings at a unit value of 6.60 Austrian schillings per volume.

During the course of the trial, counsel for the Government stated that inasmuch as the merchandise was appraised in Austrian schillings at a time when Austria did not exist, there was grave doubt as to the validity of the appraisement, and requested that if the court should find the appraisement to be invalid, the provisions of section 16 (b) of the Customs Administrative Act of 1938, amending section 501, Tariff Act of 1930, be invoked and the cause remanded to a single judge of the Customs Court to reappraise the merchandise.

This point has not been referred to in the Government's brief nor has plaintiff questioned the validity of the appraisement. The fact that Austria has ceased to exist as an independent entity does not indicate of itself that the merchandise could not be properly appraised in Austrian schillings, if it was actually bought and sold in that currency, as the appraiser apparently found. The evidence herein is not sufficient to overcome the presumption of correctness attaching to the appraiser's valuation.

The appraiser having appraised the merchandise in Austrian schillings, it was the duty of the collector to convert the same into United States dollars in accordance with section 522 of the Tariff Act of 1930. *Giovanni Ascione* v. *United States*, 32 Treas. Dec. 725, T. D. 37252. *United States* v. *Gothic Watch Co.*, 23 Cust. Ct. 235, Reap. Dec. 7712.

Said section 522 provides, among other things:

(b) PROCLAIMED VALUE BASIS OF CONVERSION.—For the purpose of the assessment and collection of duties upon merchandise imported into the United States on or after the day of the enactment of this Act, wherever it is necessary

to convert foreign currency into currency of the United States, such conversion, except as provided in subdivision (c), shall be made at the values proclaimed by the Secretary of the Treasury under the provisions of section 25 of such Act of August 27, 1894, as amended, for the quarter in which the merchandise was exported.

(c) MARKET RATE WHEN NO PROCLAMATION.—If no such value has been proclaimed, or if the value so proclaimed varies by 5 per centum or more from a value measured by the buying rate in the New York market at noon on the day of exportation, conversion shall be made at a value measured by such buying rate. * * * For the purposes of this subdivision such buying rate shall be the buying rate for cable transfers payable in the foreign currency so to be converted; and shall be determined by the Federal Reserve Bank of New York and certified daily to the Secretary of the Treasury, who shall make it public at such times and to such extent as he deems necessary. In ascertaining such buying rate such Federal reserve bank may in its discretion (1) take into consideration the last ascertainable transactions and quotations, whether direct or through exchange of other currencies, and (2) if there is no market buying rate for such cable transfers, calculate such rate from actual transactions and quotations in demand or time bills of exchange.

In article 822 (d), Customs Regulations of 1937, it is provided:

(d) Rates of exchange for the principal foreign currencies as certified daily by the New York Federal Reserve Bank will be furnished daily by the customs information exchange to customs officials in the number of copies required, and liquidation will not be made until such Federal reserve bank rates are received. In special cases, or where a rate of currency does not appear on the daily list furnished, the collector will request such rate from the customs information exchange.

In the instant case, it appears that there was no proclaimed value for the Austrian schilling for the quarter in which the merchandise was exported (T. D. 49491) nor was any value for said schilling published by the Secretary of the Treasury in accordance with section 522 (c), *supra*. Therefore, the collector requested a value from the customs information exchange. The collector was advised as follows by the Acting Commissioner of Customs in a letter dated October 13, 1942 (defendant's collective exhibit 8):

The bank advises that upon a consideration of all the relevant facts and circumstances, it does not feel that it would be warranted in certifying a rate for the Austrian schilling for any date subsequent to June 13, 1938.

As the Bureau stated in its letter to you of December 13, 1940, it is understood that a 3:2 ratio has been set up by the German authorities as the relationship between the Austrian schilling and the reichsmark. On the basis of this ratio, the Austrian schilling for June 22, 1938, would be worth approximately 27¢ in United States currency.

As there is no proclaimed rate for the Austrian schilling for the quarter beginning July 1, 1938, and as no certified rate for that currency is available, it is believed that you would be justified in converting the Austrian schilling into United States money on the basis of the above-mentioned ratio between the Austrian schilling and the German reichsmark. You shall be governed accordingly.

The question before the court is whether the collector was justified in following this procedure. It is apparent that the provisions of

section 522, *supra*, do not contemplate a situation like that involved herein where one country has incorporated another and is in the process of substituting its currency for that of the latter. According to the decrees of the German Government, heretofore mentioned, the reichsmark had become legal tender in Austria, notes of the Austrian National Bank had ceased to be legal tender on April 25, 1938, but were redeemable until December 31, 1938, and Austrian coins continued to be legal tender. The itemized invoice in this case which is part of the consular invoice gives a home market value for the merchandise in Austrian schillings which is in contradiction to the statement on the reverse side of the consular invoice which gives such value in reichsmarks. We might conclude, therefore, that both currencies were being used. The Federal Reserve Bank of New York certified buying rates for Austrian schillings after the date of the German decrees and up until June 13, 1938. However, it did not feel warranted in certifying a buying rate for the date of exportation involved herein, June 22, 1938.

Under the circumstances, the collector accepted the ratio of 3 schillings to 2 reichsmarks established by the German Government and converted the Austrian schillings on the basis of this ratio and the value of the German reichsmark as certified by the Federal Reserve bank for the date of exportation herein (T. D. 49632). Plaintiff claims that there is no provision in the tariff law which justified the conversion of foreign currency on the basis of an exchange rate adopted by foreign authorities. However, section 522 (c), *supra*, provides that the Federal Reserve bank may take into consideration transactions and quotations, *whether direct or through exchange of other currencies.* Furthermore, the German decrees may be recognized under the doctrine of comity. *Hilton* v. *Guyot*, 159 U. S. 113; 15 C. J. S. 836–839, and cases there cited.

In *Barr* v. *United States*, 324 U. S. 83, the court said that the history of currency value legislation made clear that search had been made for a measure of the true dollar value of imported merchandise. In the instant case, the home consumption value of 6.60 Austrian schillings given on the white sheet which forms part of the consular invoice (defendant's exhibit 4) and that of 4.40 reichsmarks given on the reverse side of the consular invoice are in accordance with the 3 to 2 ratio provided by the German decree. Therefore, conversion of 6.60 Austrian schillings on that ratio plus the certified value of the reichsmark or conversion of 4.40 reichsmarks at the certified rate results in the same amount of dollars, $1.77, which appears to be the true dollar equivalent of the home market value of the imported merchandise.

In *Klingerit, Inc.* v. *United States*, 14 Cust. Ct. 435, Reap. Dec. 6159, the merchandise was exported from Austria in May 1938, after

the German invasion. It was appraised on the basis of a unit foreign value expressed in Austrian schillings, followed by the appraiser's statement that the merchandise was "Appraised in German Reichsmarks at the ratio of one Reichsmark equals 1.50 Austrian Schillings of the foregoing appraisal basis." The court held that the appraiser's action was not a conversion of currency and that the appraisal was in reichsmarks, stating (p. 440):

* * * And while he [the appraiser] did not specifically state the exact number of reichsmarks per unit of appraisement, nevertheless, he did give sufficient information upon which the collector in due course could proceed to convert the currency "For the purpose of the assessment and collection of duties," pursuant to section 522 of the Tariff Act of 1930. Note *Collin & Gissel* v. *United States*, 71 Treas. Dec. 1227, Reap. Dec. 4004, affirmed in 72 Treas. Dec. 1210, Reap. Dec. 4183, and *United States* v. *Sontag's Shoe Stores*, 14 Cust. Ct. 314, Reap. Dec. 6091, decided February 1, 1945, reversing Reap. Dec. 5797.

The court did not question the collector's authority to ascertain the reichsmark equivalent to the Austrian schilling but in effect conceded it.

In *Persian Commissioners* v. *United States*, T. D. 14827, the merchandise was invoiced in Persian krans, and the importer protested against the collector's decision as to the value of the same. The court said:

We do not find in the periodical reports of the Secretary of the Treasury, promulgating the value of foreign coins, as required by section 52 of the act of October 1, 1890, any estimate of the value of the Persian kran; nor does the collector in his report state that he is in possession of any evidence as to the correctness of his action.

The only evidence that appears in the record is a statement from the Imperial Bank of Persia, in London, England, under date of January 3, 1894, by which it appears that the rate of exchange in Persia on London, in December, 1893, was 45 krans per pound sterling, or the equivalent of 9¼ krans to the American dollar; and this statement is certified as bearing the signature of the chief accountant of said bank by the secretary of the Persian legation.

On this evidence, it was held that the Persian kran should be converted at the rate of 9¼ krans to the United States dollar. As in the instant case, the value of the foreign currency was found by converting it first into the currency of a third country and then converting that currency into United States dollars.

In view of all the foregoing, we hold that the merchandise herein was entered and appraised at 6.60 Austrian schillings per volume and that the collector's method of converting the value of the Austrian schillings into United States dollars was justified. The protest is overruled and judgment will be entered accordingly.